# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 11-1898
_____

| | | |
|---|---|---|
| Tom Brady; Drew Brees; Vincent Jackson; Ben Leber; Logan Mankins; Peyton Manning; Von Miller; Brian Robison; Osi Umenyiora; Mike Vrabel; Carl Eller; Priest Holmes; Obafemi Ayanbadejo; Ryan Collins; Antawan Walker, individually, and on behalf of all others similarly situated, | * * * * * * * * * | |
| Appellees, | * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| National Football League; Arizona Cardinals Football Club, LLC; Atlanta Falcons Football Club, LLC; Baltimore Ravens Limited Partnership; Buffalo Bills, Inc.; Panthers Football, LLC; The Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns Football Company LLC; Dallas Cowboys Football Club, Ltd; PDB Sports, Ltd., doing business as The Denver Broncos Football Club, Ltd.; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston NFL Holdings, L.P.; Indianapolis Colts, Inc.; Jacksonville Jaguars, Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football, LLC; New England Patriots L.P.; New Orleans Louisiana Saints, | * * * * * * * * * * * * * * * * * * * | |

L.L.C.; New York Football Giants, Inc.; *
New York Jets LLC; The Oakland          *
Raiders, L.P.; Philadelphia Eagles,     *
LLC; Pittsburgh Steelers LLC; The St.   *
Louis Rams LLC; Chargers Football       *
Company, LLC; San Francisco Forty       *
Niners, Limited; Football Northwest     *
LLC; Buccaneers Limited Partnership;    *
Tennessee Football, Inc.; Pro-Football, *
Inc.,                                   *
                                        *
             Appellants.                *
                        _____

                    Submitted:  June 3, 2011
                      Filed:  July 8, 2011
                        _____

Before BYE, COLLOTON, and BENTON, Circuit Judges.
                        _____

COLLOTON, Circuit Judge.

       This appeal arises from an action filed by nine professional football players and one prospective football player ("the Players") against the National Football League and its thirty-two separately-owned clubs, more commonly known as football teams (collectively, "the NFL" or "the League").  On March 11, 2011, a collective bargaining agreement between the League and a union representing professional football players expired.  The League had made known that if a new agreement was not reached before the expiration date, then it would implement a lockout of players, during which the athletes would not be paid or permitted to use club facilities.  The League viewed a lockout as a legitimate tactic under the labor laws to bring economic pressure to bear on the players as part of the bargaining process. *See Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 301-02, 318 (1965).

-2-

The players, aware of the League's strategy, opted to terminate the union's status as their collective bargaining agent as of 4:00 p.m. on March 11, just before the agreement expired. Later that day, the Players filed an action in the district court alleging that the lockout planned by the League would constitute a group boycott and price-fixing agreement that would violate § 1 of the Sherman Antitrust Act. The complaint explained that "the players in the NFL have determined that it is not in their interest to remain unionized if the existence of such a union would serve to allow the NFL to impose anticompetitive restrictions with impunity." The plaintiffs also alleged other violations of the antitrust laws and state common law.

The League proceeded with its planned lockout on March 12, 2011. The Players moved for a preliminary injunction in the district court, urging the court to enjoin the lockout as an unlawful group boycott that was causing irreparable harm to the Players. The district court granted a preliminary injunction, and the League appealed. We conclude that the injunction did not conform to the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, and we therefore vacate the district court's order.

A.

Some historical background will place this case in context. In *Radovich v. NFL*, 352 U.S. 445, 451-52 (1957), the Supreme Court held that professional football – unlike major league baseball – is not categorically exempt from the antitrust laws. In 1968, the National Labor Relations Board ("NLRB") recognized the NFL Players Association ("NFLPA") as the exclusive bargaining representative of all NFL players, and the NFL and the NFLPA entered into their first collective bargaining agreement ("CBA"). *Mackey v. NFL*, 543 F.2d 606, 610 (8th Cir. 1976). Since then, the relationship between the League and its players has been punctuated by both collective bargaining agreements and antitrust lawsuits.

In 1972, several players filed an antitrust action against the League in *Mackey v. NFL*, alleging that the League's policy with respect to free agents – that is, players whose contracts with a particular team have expired – violated § 1 of the Sherman Act, 15 U.S.C. § 1.[1] *Mackey*, 543 F.2d at 609. This court concluded that the restriction at issue, known as the "Rozelle Rule," unreasonably restrained trade in violation of § 1, because it was "significantly more restrictive than necessary to serve any legitimate purposes" of maintaining competitive balance in the NFL. *Id.* at 622. While the *Mackey* litigation was pending, the CBA between the League and the NFLPA expired, and seventy-eight NFL players filed a separate class action antitrust suit against the League. *See Reynolds v. NFL*, 584 F.2d 280, 282 (8th Cir. 1978); *Alexander v. NFL*, No. 4-76-123, 1977 WL 1497, at *1 (D. Minn. Aug. 1, 1977). In 1977, the League and the players entered into a settlement agreement incorporating a new CBA that implemented a revised system of free agency known as "right of first refusal/compensation." *Alexander*, 1977 WL 1497, at *1-2. As part of the settlement, the League withdrew its petition for a writ of *certiorari* in *Mackey*. *Reynolds*, 584 F.2d at 282.

This state of affairs lasted until December 1982, when the NFL players engaged in a fifty-seven-day strike before agreeing to a new CBA that included a modified version of the "right of first refusal/compensation" system. *Powell v. NFL*, 930 F.2d 1293, 1295-96 (8th Cir. 1989); *Powell v. NFL*, 678 F. Supp. 777, 780-81 (D. Minn. 1988), *rev'd*, 930 F.2d 1293. This CBA expired in 1987, and when negotiations for a new CBA proved unsuccessful, the NFLPA conducted another strike. *Powell*, 930 F.2d at 1296. Immediately after the strike ended in October 1987, the NFLPA and several individual players commenced an antitrust suit in *Powell v. NFL*, alleging among other things that the League's free agency restrictions violated the Sherman Act. *Id.* This court held that a nonstatutory labor exemption from the antitrust laws

---

[1]That section provides, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

shielded the League from antitrust liability. *Id.* at 1303. The Supreme Court "has implied this exemption from federal labor statutes," reasoning that "to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236-37 (1996). This court in *Powell* concluded that the nonstatutory labor exemption can extend beyond an impasse in negotiations, and that application of the exemption was appropriate in that case, because the parties still could resolve their differences through the use of the "offsetting tools" of labor law, including strikes, lockouts, and petitions for intervention by the NLRB. 930 F.2d at 1302-03. The court declined, however, "to look into the future and pick a termination point for the labor exemption." *Id.* at 1303.

Two days after this court's decision in *Powell*, on November 3, 1989, the NFLPA's executive committee decided to abandon the organization's collective bargaining rights in an effort to end the NFL's nonstatutory labor exemption from the antitrust laws. *Powell v. NFL*, 764 F. Supp. 1351, 1354 (D. Minn. 1991). The NFLPA disclaimed its union status, enacted new bylaws prohibiting it from engaging in collective bargaining with the League, filed a labor organization termination notice with the U.S. Department of Labor, obtained a reclassification by the Internal Revenue Service as a "business league" rather than a labor organization, and notified the NFL that it would no longer represent players in grievance proceedings. *Id.*

In 1990, eight individual football players brought a new antitrust action against the League in *McNeil v. NFL*, contending that new player restraints imposed by the League during the 1990-1991 season violated § 1 of the Sherman Act. *Id.* at 1359. Following a ten-week trial in late 1992, a jury rendered a verdict in favor of the *McNeil* plaintiffs and awarded substantial damages. *See McNeil v. NFL*, No. 4-90-476, 1992 WL 315292, at *1 (D. Minn. Sept. 10, 1992).

Two new antitrust lawsuits were filed in the two-week period after the *McNeil* verdict. Ten NFL players brought suit in *Jackson v. NFL*, alleging that the League's free agency restrictions violated the Sherman Act. *Jackson v. NFL*, 802 F. Supp. 226, 228-229, 234 n.14 (D. Minn. 1992). Five other NFL players instituted *White v. NFL*, a class action alleging that various practices of the League, including free agency restraints, the college draft, and the use of a standard NFL player contract, violated the antitrust laws. *See White v. NFL*, 822 F. Supp. 1389, 1395 (D. Minn. 1993).

Many disputes between the League and the players were resolved when the parties entered into a class action settlement agreement in *White*. In January 1993, the parties reached a tentative agreement designed to resolve *White* and related cases. *Id.* at 1395-96. The NFLPA subsequently collected authorization cards from NFL players re-designating the organization as the players' exclusive collective bargaining representative, and the NFL voluntarily recognized the NFLPA as the players' union on March 29, 1993. *Id.* at 1396-97. The district court approved the parties' Stipulation and Settlement Agreement ("SSA") in April 1993, and the NFL and the NFLPA entered into a new CBA shortly thereafter. *White v. NFL*, 836 F. Supp. 1458, 1465-66 (D. Minn. 1993). The NFL and the NFLPA agreed to amend various portions of the SSA to conform to the provisions of the new CBA, and the district court approved the requested amendments. *Id.* at 1466, 1468. The court entered a consent decree incorporating the terms of the amended SSA on August 20, 1993. *White v. NFL*, 836 F. Supp. 1508, 1511 (D. Minn. 1993).

In 1996, the Supreme Court decided an important case concerning professional football and the scope of the nonstatutory labor exemption from the antitrust laws, *Brown v. Pro Football, Inc.*, 518 U.S. 231. After the expiration of the collective bargaining agreement in 1987, the League and the NLFPA bargained to impasse over player salaries for members of each club's "developmental squad," which consisted of up to six first-year players who were not on the regular player roster. The League then unilaterally implemented an agreement among the clubs to pay a salary of $1000

per week to these players. A group of the players sued, alleging that the employers' agreement violated § 1 of the Sherman Act. The Supreme Court held that the nonstatutory labor exemption applied to the employer conduct at issue, which (1) took place during and immediately after a collective-bargaining negotiation, (2) grew out of, and was directly related to, the lawful operation of the bargaining process, (3) involved a matter that the parties were required to negotiate collectively, and (4) concerned only the parties to the collective-bargaining relationship. *Id*. at 250. In a closing paragraph, the Court added the following:

> Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process. See, *e.g.*, 50 F.3d, at 1507 (suggesting that exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union); *El Cerrito Mill & Lumber Co.*, 316 N.L.R.B., at 1006-1007 (suggesting that "extremely long" impasse, accompanied by "instability" or "defunctness" of multiemployer unit, might justify union withdrawal from group bargaining). We need not decide in this case whether, or where, within these extreme boundaries to draw that line. Nor would it be appropriate for us to do so without the detailed views of the Board, to whose "specialized judgment" Congress "intended to leave" many of the "inevitable questions concerning multiemployer bargaining bound to arise in the future."

*Id*. (citations omitted).

The Supreme Court's most recent decision regarding this industry came in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201 (2010). The Court held that the alleged conduct of the NFL teams in forming National Football League Properties to develop, license, and market their individually owned intellectual property, and then to grant an exclusive license for that property, was concerted action not categorically

beyond the coverage of § 1 of the Sherman Act. At the same time, the Court remarked that "[f]ootball teams that need to cooperate are not trapped by antitrust law," to wit: "The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions." *Id.* at 2216. Yet these interests did not justify treating the NFL teams as a single entity for purposes of § 1 of the Sherman Act when it came to the marketing of their intellectual property. *Id.* at 2217.

B.

Since 1993, the players and the League have operated under the *White* SSA, and the district court has continued to oversee the settlement by resolving numerous disputes over the terms of the SSA and CBA. *White v. NFL*, 585 F.3d 1129, 1133 (8th Cir. 2009). Whenever the NFL and the NFLPA have agreed to change a provision in the CBA, a conforming change has also been made to the SSA. *Id.* at 1134. The SSA has been amended several times over the past eighteen years, most recently in 2006, when the NFL and the NFLPA reached an agreement on a new CBA that would last through the 2012-2013 football season. *See id.* The 2006 SSA and CBA gave both sides the right to opt out of the final two years of each agreement upon written notice.

In May 2008, the NFL opted out of the final two years of the SSA and CBA, citing concerns about operating costs and other elements of the agreements. *White v. NFL*, No. 4-92-906, 2011 WL 706319, at *1 (D. Minn. March 1, 2011). As a result, the SSA and CBA were scheduled to expire in early March 2011. *Id.* Although the NFL and the NFLPA engaged in more than two years of negotiations toward a new CBA, the League and the players were unable to reach an agreement. The League filed an unfair labor practice charge with the NLRB in February 2011, asserting that the union failed to confer in good faith. The Players say that the charge is meritless.

-8-

As the deadline approached, a substantial majority of NFL players voted to end the NFLPA's status as their collective bargaining representative. On March 11, 2011 – the expiration date of the SSA and CBA – the NFLPA notified the NFL that it disclaimed interest in continuing to serve as the players' collective bargaining representative, effective at 4:00 p.m. The NFLPA also amended its bylaws to prohibit collective bargaining with the League or its agents, filed a labor organization termination notice with the Department of Labor, asked the Internal Revenue Service to reclassify the NFLPA as a professional association rather than a labor organization, and notified the NFL that it would no longer represent players bringing grievances against the League.

The League filed an amended unfair labor practice charge on March 11, alleging that the NFLPA's disclaimer was a "sham" and that the combination of a disclaimer by the union and subsequent antitrust litigation was "a ploy and an unlawful subversion of the collective bargaining process." The Players dispute the charge, citing an advice memorandum of an associate general counsel of the NLRB in *Pittsburgh Steelers, Inc.*, No. 6-CA-23143, 1991 WL 144468 (NLRB G.C. June 26, 1991). The memorandum concluded that the NLFPA's 1989 disclaimer was valid, and that it was "irrelevant" whether the disclaimer was motivated by "litigation strategy," so long as the disclaimer was "otherwise unequivocal and adhered to." *Id*. at *2 & n.8.

The Players, funded by the NFLPA, commenced this action on the same day as the disclaimer, March 11, 2011. Four of the plaintiffs are under contract with an NFL club; five are free agents, and one is a prospective player who had entered the 2011 NFL draft and was ultimately selected in that draft. The Players brought this action on behalf of themselves and a putative class consisting of players who are under contract with any NFL club, free agents seeking employment with any NFL club, and college or other players who have not previously been under contract with any NFL

club and who are eligible to play as a rookies for any club.  As the case comes to us, no class has been certified.

The Players explained in their complaint that "[t]he players . . . have ended the role of the NFLPA as their collective bargaining representative and no longer have a collective bargaining relationship with the NFL defendants."  They asserted, based on the Supreme Court's language in *Brown*, that the nonstatutory labor exemption therefore no longer protects the League from antitrust liability.  The complaint alleged that the NFL's planned lockout was an illegal group boycott and price-fixing arrangement that violated § 1 of the Sherman Act.  In addition, the Players claimed that the lockout would violate state contract law by depriving players of contractually owed compensation, and would violate state tort law by interfering with players' existing contracts as well as their opportunities to enter into new contracts with NFL teams.

The complaint further alleged that the League planned to institute or to continue several anticompetitive practices that would violate § 1 of the Sherman Act, including a limitation on the amount of compensation that can be paid to recently drafted first-year "rookie" players, a cap on salaries for current players, and "franchise player" and "transition player" designations that restrict the ability of free agents to join a team other than their former team.  The Players requested damages and declaratory and injunctive relief regarding these practices, including an injunction prohibiting the League from implementing or continuing the lockout.[2]

The SSA and CBA expired at 11:59 p.m. on March 11.  At 12:00 a.m. on March 12, the League instituted a lockout of members of the NFLPA's "bargaining unit,"

---

[2]Several retired professional football players brought a similar but separate action on March 28, 2011, also seeking a preliminary injunction.  The district court consolidated the two actions, and denied the retired players' motion for a preliminary injunction as moot after issuing an injunction in the previously filed action.

which includes professional football players under contract, free agents, and prospective players who have been drafted by or entered into negotiations with an NFL team. The NFL informed players under contract that the lockout would prohibit them from entering League facilities, from receiving any compensation or benefits, and from performing any employment duties including playing, practicing, working out, attending meetings, making promotional appearances, and consulting medical and training personnel except in limited situations. The League also notified the players that they could be required to report back to work immediately "[o]nce a new labor agreement is reached" between the NFL and the NFLPA.

On April 25, 2011, the district court granted the Players' motion to enjoin the lockout, rejecting the League's assertions that the court lacked jurisdiction to enter the injunction, that the court should defer to the primary jurisdiction of the NLRB, and that the League is in any event immune from antitrust liability under the nonstatutory labor exemption. *See Brady v. NFL*, No. 11-639, 2011 WL 1535240, at *37 (D. Minn. Apr. 25, 2011) [hereinafter *Brady I*]. The court concluded that the Norris-LaGuardia Act ("NLGA" or "Act"), 29 U.S.C. § 101 *et seq.*, which restricts the power of federal courts to issue injunctions in cases "involving or growing out of a labor dispute," *id.* § 1, was inapplicable, because the term "labor dispute" connotes a dispute between an employer and a union, and the Act therefore does not apply "absent the present existence of a union." *Brady I*, 2011 WL 1535240, at *24-26. In the court's view, the conflict between the League and the players ceased to be a "labor dispute" subject to the Act when the NFLPA terminated its status as a union by disclaiming its role as the players' collective bargaining representative. *Id.* at *26-27.

The district court also declined to stay the action pending the NLRB's resolution of the League's pending unfair labor practice charges. *See id.* at *9. The court determined that a stay would not be appropriate because the delay could cause significant hardship for the plaintiffs, and because "[t]he Board has articulated the standard under which disclaimers must be evaluated in a clear and consistent fashion,

and application of that established standard requires no particular specialized expertise." *Id.* at *14-15, 18. Finally, the district court concluded that the nonstatutory labor exemption does not protect the League from antitrust liability related to the lockout. *See id.* at *34. In the court's view, the exemption applies only to agreements concerning "mandatory subjects of collective bargaining," such as wages, hours, and other terms and conditions of employment, and an employer's imposition of a lockout is not exempted because "[a] lockout is not a substantive term or condition of employment." *Id.* at *35-36. The court distinguished the Supreme Court's decision in *Brown* on the basis that the parties here "have left the collective bargaining framework entirely." *Id.* at *35.

The district court's order stated only that "[t]he 'lockout' is enjoined," *id.* at *37, and did not expressly define the scope of the injunction. In concluding that the plaintiffs would suffer irreparable harm absent an injunction, however, the court indicated that its order would prevent the harm that players would suffer if the League were able to bar them from playing or practicing for an extended period of time. *See id.* at *29-30. The court also suggested that the injunction would provide free agents and rookies with significant opportunities to market their services to individual teams, *see id.* at *31-32, although it later remarked in denying a motion for stay pending appeal that the injunction did not require the League to enter into contracts. *See Brady v. NFL*, No. 11-639, 2011 WL 1578580, at *5 (D. Minn. Apr. 27, 2011). From this discussion, we understand the court's order to mean that the League must allow players under contract to play football, attend practice sessions, and collect compensation, and that the League must provide free agents and rookies with an opportunity to market their services to potential employers.

The League appealed, challenging the district court's application of the Norris-LaGuardia Act, the doctrine of primary jurisdiction, and the nonstatutory labor exemption. This court granted the NFL's motion to expedite the appeal and its motion

-12-

for a stay of the district court's order pending appeal.  We now consider the merits of the appeal.

## II.

We consider first the League's contention that the Norris-LaGuardia Act deprived the district court of jurisdiction to enter the injunction.  The NLGA, enacted in 1932, curtails the authority of a district court to issue injunctions in a labor dispute.  "Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act."  *Marine Cooks & Stewards v. Pan. S.S. Co.*, 362 U.S. 365, 369 (1960).

The Supreme Court has explained that the NLGA responded directly to the Court's construction of § 20 of the Clayton Act of 1914, 29 U.S.C. § 52, in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443 (1921), and to other decisions of federal courts entering or upholding injunctions in labor disputes.  *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 438 (1987).  The Clayton Act bars federal courts, "in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment," from issuing an injunction to prohibit "any person or persons" from "ceasing to perform any work or labor" or "terminating any relation of employment." 29 U.S.C. § 52.  In *Duplex Printing*, however, the Court held that § 20 of the Clayton Act did not prohibit an injunction against a secondary boycott undertaken by union members who were not "proximately and substantively concerned as parties to an actual dispute respecting the terms or conditions of their own employment." 254 U.S. at 472.  Similarly, in *Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n*, 274 U.S. 37 (1927), the Court ruled that § 20 did not prohibit an injunction against a union's refusal to perform work on stone produced by a particular company with

which the union had an ongoing dispute. *Id.* at 42-43, 55. The NLGA effectively superseded these decisions by precluding federal courts from enjoining certain secondary activity by workers in labor disputes.

The language of the Act, however, extends well beyond the specific issues decided in such cases as *Duplex Printing* and *Bedford Cut Stone*. The impetus for the NLGA was dissatisfaction with injunctions entered against workers in labor disputes, but the statute also requires that an injunction against an employer participating in a labor dispute must conform to the Act. *E.g.*, *Bodecker v. Local Union No. P-46*, 640 F.2d 182, 185 (8th Cir. 1981); *District 29, United Mine Workers v. New Beckley Mining Corp.*, 895 F.2d 942, 944-47 (4th Cir. 1990); *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237, 1238 (9th Cir. 1977); *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876-77 (6th Cir. 1972); *see Greyhound Lines, Inc. v. Amalgamated Transit Union, Div. 1384*, 429 U.S. 807 (1976). This case requires us to decide whether, and if so how, the Act applies to the district court's injunction against the League.

To determine whether the NLGA forbids or places conditions on the issuance of an injunction here, we begin with the text of the statute. Section 1 provides that "[n]o court of the United States . . . shall have jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter." 29 U.S.C. § 101. As noted, the district court concluded that the Act is inapplicable to this action, because the case is not one "involving or growing out of a labor dispute."

Section 13(c) of the Act states that "[t]he term 'labor dispute' includes *any controversy concerning terms or conditions of employment*, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C.

§ 113(c) (emphasis added). This lawsuit is a controversy concerning terms or conditions of employment. The Players seek broad relief that would affect the terms or conditions of employment for the entire industry of professional football. In particular, they urge the court to declare unlawful and to enjoin several features of the relationship between the League and the players, including the limit on compensation that can be paid to rookies, the salary cap, the "franchise player" designation, and the "transition player" designation, all of which the Players assert are anticompetitive restrictions that violate § 1 of the Sherman Act. The district court did not appear to question this point, even distinguishing authority cited by the Players on the ground that it involved a dispute over the sale of commodities rather than "a controversy over terms and conditions of employment." *Brady I*, 2011 WL 1535240, at *24 n.44.

We are not convinced by the Players' contention that because § 13(c) uses the term "includes," rather than "means," to introduce the substance of a "labor dispute," Congress did not fully define the term. They urge that § 13(c) merely expanded in one respect (to disputes outside the employer-employee relationship) a preexisting definition of "labor dispute" – a definition that was not codified and that, according to the Players, extended only to disputes involving organized labor. Whatever might be the significance of the verb "include" when used in other contexts, *cf. Massachusetts v. EPA*, 549 U.S. 497, 556-58 (2007) (Scalia, J., dissenting), Congress stated in § 13 of the NLGA that "labor dispute" is "defined in this section," 29 U.S.C. § 113(a), and the Supreme Court consistently has described § 13(c) as a "definition" of "labor dispute." *Burlington N. R.R. Co.*, 481 U.S. at 443; *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 711 n.11, 712 (1982); *H.A. Artists & Assocs. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 n.14, 715 (1981); *Order of R.R. Telegraphers v. Chi. & N.W. Ry. Co.*, 362 U.S. 330, 335 (1960); *see also Bodecker*, 640 F.2d at 185. Not only has the Supreme Court repeatedly characterized § 13(c) as a definition, but contrary to the suggestion that an established meaning should be used to narrow the text, the Court has observed that "the statutory definition itself is extremely broad," *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at

712, and explained that "Congress made the definition broad because it wanted it to be broad." *Order of R.R. Telegraphers*, 362 U.S. at 335-36.

The Act also states expressly that "[a] case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation." 29 U.S.C. § 113(a). This case, of course, involves persons engaged in the "same industry," namely, professional football. The statute continues that such a case "shall be held to involve or grow out of a labor dispute" when "such dispute is . . . between one or more employers or associations of employers and one or more employees or associations of employees." *Id.* This dispute is between one or more employers or associations of employers (the League and the NFL teams) and one or more employees (the Players under contract). By the plain terms of the Act, this case "shall be held to involve or grow out of a labor dispute."

The district court reached a contrary conclusion by departing from the text of § 13(a). The court thought the phrase "one or more employees or associations of employees" did not encompass the Players in this dispute, because "one or more employees" means "individual *unionized* employee or employees." *Brady I*, 2011 WL 1535240, at 24 n.43 (emphasis added). We see no warrant for adding a requirement of unionization to the text.

A similar argument did not persuade the Supreme Court in *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552 (1938). There, a company sought an injunction against the New Negro Alliance, which the Supreme Court described as "a corporation composed of colored persons, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises." *Id.* at 555. The Alliance allegedly had conspired to picket and boycott one of the company's grocery stores to pressure the store to employ African-American clerks. *Id.* at 555-56. The company claimed, among other things, that the Alliance's acts

were "unlawful, [and] constitute[d] a conspiracy in restraint of trade." *Id.* at 558-59. The district court granted an injunction against the Alliance. The court of appeals affirmed, reasoning in part as follows:

> "The controversy here is not a labor dispute. The defendants do not constitute a labor union or a labor organization of any kind. They do not compose, nor are they all members, of any single trade or class of trades. Their demands are not connected with any one industry. The questions about which they are now picketing have no connection with wages, hours of labor, unionization, or betterment of working conditions. . . . It is solely a racial dispute."

*New Negro Alliance v. Sanitary Grocery Co.* 92 F.2d 510, 512-13 (D.C. Cir. 1937) (quoting *A. S. Beck Shoe Corp. v. Johnson*, 274 N.Y.S. 946, 953 (N.Y. Sup. Ct. 1934)).

The Supreme Court reversed. Although no labor organization was involved in the dispute, and the company argued that "a recognized labor union or unions or individual members thereof were involved" in all but one of the "labor dispute" precedents cited by the Alliance, Brief for Respondent at 24, *New Negro Alliance*, 303 U.S. 552 (No. 511), the Court ruled that the definitions in the Act "plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute." *New Negro Alliance*, 303 U.S. at 560. The Court observed that § 13(a) provides that a case shall be held to involve or grow out of a labor dispute "when the case involves any conflicting or competing interests in a 'labor dispute' . . . of 'persons participating or interested' therein," and ruled that the Alliance and its individual members were "persons interested in the dispute." *Id.* (internal quotation omitted). If § 13(a) were limited to controversies involving unions or unionized employees, then the Court could not have reached this conclusion.

-17-

Further confirmation that the present existence of a union is not required for a "labor dispute" comes from *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962). There, a group of seven employees who were "wholly unorganized" and had "no bargaining representative" or "representative of any kind to present their grievances to their employer" staged a walkout to protest cold working conditions in a machine shop. *Id.* at 14-15. Although the employees were not part of a union, the Supreme Court held that the walkout "did grow out of a 'labor dispute' within the plain meaning of the definition of that term in § 2(9) of the [National Labor Relations] Act." *Id.* at 15. The definition of "labor dispute" in the National Labor Relations Act is "virtually identical" to the definition of "labor dispute" in the NLGA, and the two provisions "have been construed consistently with one another" by the Supreme Court. *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 711 n.11; *accord United States v. Hutcheson*, 312 U.S. 219, 234 n.4 (1941).

Even § 2 of the NLGA, cited by the Players as an interpretive guide for the Act based on its declaration of "[p]ublic policy in labor matters," conflicts with the district court's conclusion. Section 2 declares, among other things, that the "individual unorganized worker" shall be free from the interference of employers in "the designation of . . . representatives or in self-organization or in other concerted activities for the purpose of collective bargaining *or other mutual aid or protection*." 29 U.S.C. § 102 (emphasis added). Employees may engage in activities for the purpose of "mutual aid or protection" *without* the present existence of a union. *Wash. Aluminum*, 370 U.S. at 14-15; *First Nat'l Bank of Omaha v. NLRB*, 413 F.2d 921, 926 (8th Cir. 1969); *Vic Tanny Int'l, Inc. v. NLRB*, 622 F.2d 237, 241 (6th Cir. 1980); *NLRB v. Phoenix Mut. Life Ins. Co.*, 167 F.2d 983, 988 (7th Cir. 1948); *see Wilson Trophy Co. v. NLRB*, 989 F.2d 1502, 1508 (8th Cir. 1993).

The Players, citing *Ozark Air Lines, Inc. v. National Mediation Board*, 797 F.2d 557 (8th Cir. 1986), argue that circuit precedent requires "concerted labor activity" by "collectively organized employees" to establish a labor dispute under the Act.

Appellees' Br. 12. *Ozark Air Lines* did not so hold. That case involved an employee's disability retirement claim arising under the Railway Labor Act, which includes specific provisions that take precedence over the more general provisions of the NLGA. 797 F.2d at 559, 563. This court also said the case had "nothing to do with terms and conditions of employment." *Id.* at 563.

The definitions in the NLGA provide that a case shall be held to involve or grow out of a labor dispute if a controversy over terms and conditions of employment is between an employer and "*one or* more employees." 29 U.S.C. § 113(a) (emphasis added). The Act's reference to "concerted activities" appears only in the public policy section, 29 U.S.C. § 102. If the NLGA nonetheless were construed to require concerted activity by employees to establish a labor dispute, a lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment *is* "concerted activity" under § 7 of the National Labor Relations Act. *Mohave Elec. Co-op, Inc. v. NLRB*, 206 F.3d 1183, 1189 & n.8 (D.C. Cir. 2000); *Altex Ready Mixed Concrete Corp. v. NLRB*, 542 F.2d 295, 297 (5th Cir. 1976); *Leviton Mfg. Co. v. NLRB*, 486 F.2d 686, 689 (1st Cir. 1973); *see Eastex, Inc. v. NLRB*, 437 U.S. 556, 565-66 & n. 15 (1978).

The text of the Norris-LaGuardia Act and the cases interpreting the term "labor dispute" do not require the present existence of a union to establish a labor dispute. Whatever the precise limits of the phrase "involving or growing out of a labor dispute," this case does not press the outer boundary. The League and the players' union were parties to a collective bargaining agreement for almost eighteen years prior to March 2011. They were engaged in collective bargaining over terms and conditions of employment for approximately two years through March 11, 2011. At that point, the parties were involved in a classic "labor dispute" by the Players' own definition. Then, on a single day, just hours before the CBA's expiration, the union discontinued collective bargaining and disclaimed its status, and the Players filed this action seeking relief concerning industry-wide terms and conditions of employment.

Whatever the effect of the union's disclaimer on the League's immunity from antitrust liability, the labor dispute did not suddenly disappear just because the Players elected to pursue the dispute through antitrust litigation rather than collective bargaining.

## III.

The Players argue alternatively that even if this case does involve or grow out of a labor dispute, the district court's injunction conforms to the provisions of the NLGA, and should be affirmed on this alternative ground. The League counters that § 4 of the Act includes a flat prohibition on injunctions against a lockout, and, alternatively, that even if the court has authority to enjoin a lockout under certain circumstances, the district court did not comply with the procedural requirements set forth in § 7 of the Act.

## A.

Section 4 of the NLGA, 29 U.S.C. § 104, is entitled, "Enumeration of specific acts not subject to restraining orders or injunctions." It provides:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing, whether singly or in concert, any of the following acts:
>
> (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
>
> (b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

The League relies on § 4(a). It argues that this subsection forbids an injunction to prohibit a lockout. There is no uniform definition of the term "lockout," but one "practical definition" used by this court is "a refusal by [an employer] to furnish available work to its regular employees." *Laclede Gas Co. v. NLRB*, 421 F.2d 610, 615 & n.9 (8th Cir. 1970); *see also* 2 *The Developing Labor Law* 1639-40 (John E. Higgins, Jr. et al. eds., 5th ed. 2006) ("As used by the Board and the courts, . . . a lockout is most simply and completely defined as the withholding of employment by an employer from its employees for the purpose of either resisting their demands or gaining a concession from them."). The League maintains that by locking out all

professional football players, it is "[r]efusing to . . . remain in any relation of employment," and is thus doing one of the acts that cannot be enjoined according to § 4. Because § 5 of the Act states that a district court cannot issue an injunction on the ground that parties to a labor dispute are violating the antitrust laws by doing in concert the acts enumerated in § 4, the League contends that § 5 is a further barrier to the district court enjoining the lockout.[3]

The Players respond that § 4(a) does not apply to employer injunctions at all. They cite the First Circuit's decision in *De Arroyo v. Sindicato de Trabajadores Packinghouse*, 425 F.2d 281 (1st Cir. 1970), which was followed by the Ninth Circuit in *Local 2750, Lumber & Sawmill Workers Union v. Cole*, 663 F.2d 983 (9th Cir. 1981). These cases involved injunctions issued in a different context – actions under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking orders directing an employer to rehire employees who were discharged in violation of a collective bargaining agreement – but they include some reasoning that addresses more generally whether § 4(a) prohibits injunctions against employers.

*De Arroyo* rejected a "literal" application of § 4(a) sought by an employer, because the court's "understanding of the legislative history behind section 4(a)" led it to conclude that § 4(a) "was not intended as a protection for employers." *De Arroyo*, 425 F.3d at 290-91. Rather, the court said: "The 'remain in any relation of employment' language in section 4(a), which forms the basis of the Company's literal interpretation, was used, we think, simply to make clear that employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation

---

[3]Section 5 provides that "[n]o court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title." 29 U.S.C. § 105.

with their employer." *Id.* at 291. Citing § 4(b) of the Act, which proscribes an injunction to prohibit "[b]ecoming or remaining a member of any labor organization or of any employer organization," the court reasoned that "the drafters did specifically include employers when protection was intended for them." *Id.*[4] The Players, based on *De Arroyo* and *Lumber & Sawmill Workers*, urge that § 4(a) applies only to employees, with the first clause – "perform any work" – directed to "temporary work stoppages" and the second clause – "remain in any relation of employment" – aimed solely at "permanent work stoppages."

With due respect to these courts, we think it better to begin the analysis with the text of § 4(a). The introductory clause of § 4 forbids a court to issue an injunction to prohibit "*any person or persons* participating or interested" in a labor dispute from doing any of the acts set forth below, including those in § 4(a). Employers, of course, are among the persons participating in a labor dispute. The introductory clause thus plainly encompasses employers. If language in a particular subsection is applicable on its face to employees and employers alike (or to employers alone), then there is no need for a specific mention of employers. An employer against whom injunctive relief is sought may invoke the protection of a subsection as a "person . . . participating or interested" in the labor dispute. This court already has recognized that § 4(c) applies to injunctions against employers, *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1352, 1355 (8th Cir. 1995), so the premise of *De Arroyo* and *Lumber & Sawmill*

---

[4]The Sixth Circuit reached the opposite conclusion, holding that § 4(a) of the NLGA prohibits an injunction in a § 301 action requiring an employer to reinstate an employee who was discharged in violation of a collective bargaining agreement. *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1124-25 (6th Cir. 1981). This court has cited *De Arroyo* for the general proposition that a court has discretion to award equitable relief by way of reinstatement in a § 301 action, *Tatum v. Frisco Transp. Co.*, 626 F.2d 55, 60 (8th Cir. 1980); *Butler v. Local Union 823, Int'l Bhd. of Teamsters*, 514 F.2d 442, 455 (8th Cir. 1975), but has not discussed § 4(a) of the NLGA in that context.

*Workers* that employers are protected against injunction under § 4 only when specifically mentioned in § 4(b) is a non-starter under circuit precedent. *See also Bodecker*, 640 F.2d at 185-86 (holding that intra-union dispute over funding stock acquisition and profit-sharing plans by payroll deferrals was a "labor dispute," and explaining that district court had refused to issue injunction against employer's implementation of payroll deferrals because it was forbidden by § 4(c)).[5]

The disputed language in § 4(a) – "remain in any relation of employment" – may apply to an employer. Section 3 of the Act makes clear that both employers and employees can be in a "relation of employment." Section 3(b) contemplates that either party to a labor agreement can agree to "withdraw from an employment relation." 29 U.S.C. § 103(b).

The term "any" is an expansive modifier for "relation of employment," and especially where the Supreme Court has emphasized the breadth of the NLGA's prohibition on injunctions, it would be odd to apply a narrow construction of "any relation of employment." *Cf. Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219-20 &

---

[5]The Players also rely on *Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co.*, 310 F.2d 513 (7th Cir. 1962), which held that the NLGA did not deprive a district court of power to grant an injunction that prohibited railroad carriers from putting into effect revisions in work rules in a dispute governed by the Railway Labor Act. The court reasoned that "the purpose of Congress" in enacting the NLGA "was to protect only employees and unions," and found "nothing in the statement of policy to indicate any intention to deny jurisdiction to issue injunctions against employers." *Id*. at 518. To the extent that the Seventh Circuit would apply this broad reasoning outside the context of the Railway Labor Act, *but cf. Chi. Midtown Milk Distribs., Inc. v. Dean Foods Co.*, Nos. 18577, 18578, 1970 WL 2761, at *1 (7th Cir. July 9, 1970) (per curiam), it is inconsistent with this court's precedent that § 4 applies to injunctions against employers, *Bridgestone/Firestone*, 61 F.3d at 1352, 1355, and with the Players' acknowledgment that an injunction against an employer lockout in a labor dispute must conform to § 7 of the NLGA. Appellees' Br. at 43 n.3.

n.4 (2008). We therefore reject a reading of the phrase that would limit the acts encompassed by the second clause of § 4(a) to refusing to remain in any relation of employment *whatsoever*, as with a permanent and complete work stoppage. The phrase is more naturally read to mean refusing to remain in any *particular* relation of employment, whether or not the refusal is complete and permanent. This reading corresponds to the meaning of "any" in the first clause of § 4(a), which refers to a refusal "to perform *any* work." In that clause, "any" does not mean that the prohibition applies only when there is a refusal to perform any work *whatsoever*, but rather it forbids an injunction against even a refusal to perform any *particular* work – including a certain type of work, *see Jacksonville Bulk Terminals*, 457 U.S. at 704-05; *cf. Bedford Cut Stone*, 274 U.S. at 42-43, or a certain amount of work, *see Teledyne Wis. Motor v. Local 283, United Auto., Aerospace & Agric. Implement Workers*, 530 F.2d 727, 728-30 (7th Cir. 1976) – even when there is not a complete work stoppage. The term "any" should be given the same meaning in both clauses of § 4(a). *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990).

So understood, the phrase "refusing . . . to remain in any relation of employment" encompasses a non-permanent work stoppage. To "remain" is "[t]o continue unchanged in place, form, or condition," *Webster's New International Dictionary* 1802 (1932), or "[t]o continue, as in one place, condition, or character." *Funk & Wagnalls New Standard Dictionary* 2082 (1931). While a strike or lockout may not permanently end a relation of employment, it changes the condition or character of that relationship. As one court of the era expressed it: "The relation of employer and employe[e] is temporarily suspended during a strike." *Tri-City Cent. Trades Council v. Am. Steel Foundries*, 238 F. 728, 733 (7th Cir. 1917).

Other contemporaneous judicial decisions show that Congress likely would have understood "refusing to remain in any relation of employment" as including a non-permanent work stoppage such as a strike or lockout of employees. In his dissent in *Duplex Printing*, Justice Brandeis remarked that the very acts to which § 20 of the

Clayton Act applied "sever the continuity of the legal relationship" between employer and employee. 254 U.S. at 488 (Brandeis, J., dissenting). The Brandeis dissent cited a separate opinion in *Iron Molders' Union No. 125 v. Allis-Chalmers Co.*, 166 F. 45 (7th Cir. 1908), where a concurring judge described the "somewhat anomalous relationship" between employees and employers during a strike or lockout: "Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment." *Id.* at 52-53 (Grosscup, J., concurring). Other courts went so far as to hold that striking workers were no longer "employees" for purposes of the Clayton Act, either at the outset or after some duration of a strike. *See Canoe Creek Coal Co. v. Christinson*, 281 F. 559, 561-62 (W.D. Ky. 1922); *Dail-Overland Co. v. Willys-Overland, Inc.*, 263 F. 171, 188 (N.D. Ohio 1920). For these reasons, we believe a reasonable legislator in 1932 would have understood a strike or lockout of employees as a refusal to "remain in [a] relation of employment." *See also* 75 Cong. Rec. 5489 (1932) ("[T]he [Clayton] Act could not be successfully invoked when once the employer had refilled vacancies, because, it was held, there was no longer a relationship existing of employer and employee between the owner of the plant and the striker. A worker who picketed was no longer an employee to come under the protection of the Clayton Act. (See Dail-Overland Co. v. Willys-Overland, 263 Fed. 192.)") (remarks of Rep. Celler).

It is true that if § 4(a) is construed to include a lockout of employees, then the section is not symmetrical. Contrary to the League's suggestion, Appellants' Reply Br. at 16, we do not think the second clause should be understood as applying *only* to employers. *But cf. Local Union No. 861 of IBEW v. Stone & Webster Eng'g Corp.*, 163 F. Supp. 894, 896 (W.D. La. 1958). Employees may refuse to perform work under the first clause, and they may refuse to remain in a relation of employment under the second. There is likely overlap between the two clauses, and courts

-26-

(including the Supreme Court) have cited *both* clauses in holding that a strike may not be enjoined. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 410 (1976); *Order of R.R. Telegraphers*, 362 U.S. at 335; *Waller Bros. Stone Co. v. United Steelworkers*, 620 F.2d 132, 136-37 (6th Cir. 1980) (quoting *Buffalo Forge*); *U.S. Steel Corp. v. United Mine Workers*, 519 F.2d 1236, 1242, 1245 (5th Cir.1975); *Wilson & Co. v. Birl*, 105 F.2d 948, 951 (3d Cir. 1939).

The employer, by contrast, does not perform work, so it may invoke only the second clause. Insofar as an employer's lockout extends to acts by other employers who refuse to take in the "late employees" of the first employer, *see Iron Molders' Union No. 125*, 166 F. at 50, the terms of § 4(a) do not forbid an injunction against refusing to offer new work or employment. The lack of symmetry, however, does not render § 4(a) inapplicable to employers altogether. The evenhanded introductory clause of § 4 still forbids a court to enjoin "*any* person or persons" in a labor dispute from "refusing . . . to remain in any relation of employment." That the terms of § 4(a) afford employers less protection against injunctions than they afford employees (who were, after all, the target of the controversial injunctions that prompted the NLGA) does not mean that Congress gave employers no protection at all.

Aside from the text and structure of § 4, the Players argue that the policy of the NLGA and the legislative history support their position that § 4(a) offers no protection to employers. To be sure, the policy stated in § 2 is that the individual unorganized worker should be free from the interference, restraint, or coercion of employers in the designation of representatives, self-organization, or other concerted activities. But it does not follow that a prohibition on injunctions against employer lockouts is contrary to the policy of the Act. The Supreme Court has observed that while the Act was designed to protect workingmen, the broader purpose was "to prevent the injunctions of the federal courts from *upsetting the natural interplay of the competing economic forces of labor and capital*." *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 40 (1957) (emphasis added). An employer's lockout is part of this interplay;

-27-

it is not the equivalent of a judicial injunction that interferes with the ability of workers to exercise organized economic power.

The Court elsewhere explained that "powerful judicial dissents," such as that of Justice Brandeis in *Duplex Printing*, urged that labor disputes were an "area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts." *Hutcheson*, 312 U.S. at 231. In support of that view, the Brandeis dissent cited this excerpt from the 1915 Report of the Committee on Industrial Relations:

> [T]here are apparently, only two lines of action possible: First to restrict the rights and powers of employers to correspond in substance to the powers and rights now allowed to trade unions, and second, to remove all restriction which now prevent the freedom of action of both parties to industrial disputes, retaining only the ordinary civil and criminal restraints for the preservation of life, property and the public peace. The first method has been tried and failed absolutely. * * * *The only method therefore seems to be the removal of all restrictions upon both parties, thus legalizing the strike, the lockout, the boycott, the blacklist, the bringing in of strike-breakers, and peaceful picketing*.

*Duplex Printing*, 254 U.S. at 486 n.7 (Brandeis, J., dissenting) (emphasis added); *see also* 75 Cong. Rec. 5478 (1932) (remarks of Rep. LaGuardia) ("If the courts had administered even justice to both employers and employees, there would be no need of considering a bill of this kind now."); *id*. at 4915 (remarks of Sen. Wagner) ("The policy and purpose which give meaning to the present legislation is its implicit declaration that the Government shall occupy a neutral position, lending its extraordinary power neither to those who would have labor unorganized nor to those who would organize it and limiting its action to the preservation of order and the restraint of fraud."). A one-way interpretation of § 4(a) – prohibiting injunctions against strikes but not against lockouts – would be in tension with the purposes of the Norris-LaGuardia Act to allow free play of economic forces and "to withdraw federal

-28-

courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer." *Marine Cooks & Stewards*, 362 U.S. at 369 n.7. We are not convinced that the policy of the Act counsels against our textual analysis of § 4(a). *Cf. Am. Med. Ass'n v. United States*, 317 U.S. 519, 535 (1943) ("It is not our province to define the purpose of Congress apart from what it has said in its enactments, and if [a party's] activities fall within the classes defined by the [Clayton and Norris-LaGuardia] acts, we are bound to accord [the party] . . . the benefit of the legislative provisions.").[6]

The Players also contend that the legislative history of the NLGA shows that § 4(a) prohibits only injunctions against employees. They cite a House Committee Report, which states that § 4 was "intended by more specific language" to overcome the effects of judicial decisions that upheld injunctions against workers. H.R. Rep. 72-669, at 728 (1932). They point as well to then-Professor Frankfurter's treatise, which characterized § 4(a) as "declaratory of the modern common law right to strike." Felix Frankfurter & Nathan Greene, *The Labor Injunction* 217-18 (1930). *Cf. Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 469 n.3 (1957) (Frankfurter, J., dissenting). These materials indicate that Members of Congress, and Professors Frankfurter and Greene as drafters of proposed legislation, were determined to forbid federal courts from entering injunctions against workers participating in labor

---

[6]The First Circuit in *De Arroyo* said that the employer's interpretation of § 4(a) in that case "completely disregard[ed] the primary purpose behind the anti-injunction provisions," 425 F.2d at 290-91, but that case did not involve a lockout, and the court observed in the same discussion that "the reemployment of improperly discharged employees can hardly be said to be one of the abuses sought to be eliminated by the Norris-LaGuardia Act." *Id.* at 291. *See also Lumber & Sawmill Workers*, 663 F.2d at 986-87 (discussing policy reasons that favor according federal courts power to order reinstatement of employees discharged in violation of collective bargaining agreements).

disputes.  But they do not address the specific question whether § 4(a) also prohibits injunctions against employers.[7]

Other materials cited by the League suggest that Members of Congress did contemplate that employers could invoke the plain language of § 4(a), although they do not address the precise question either.  S. Rep. No. 72-163, at 19 (1932) ("[I]t will be observed that this section [§ 6], *as do most all of the other prohibitive sections of the bill*, applies both to organizations of labor and organizations of capital.  The same rule throughout the bill, wherever it is applicable, applies both to employers and employees, and also to organizations of employers and employees.") (emphasis added); 75 Cong. Rec. 4507 (1932) ("*Wherever it can be done this bill applies equally to organizations of labor and to organizations of capital.* Organizations of employees and organizations of capital are treated exactly the same.") (remarks of Sen. Norris) (emphasis added); *id.* at 4509 ("[This bill] attempts to weigh in the scales of justice all the elements which ought to be considered in passing upon controversies between

---

[7]The Players argue that the Senate's rejection of an amendment that would have included "employers" in the policy statement of § 2, 75 Cong. Rec. 4766, demonstrates that "Congress had no intent to relieve employers of any liability under the antitrust laws."  Appellees' Br. 46-47 (internal quotation omitted).  This bit of history does not alter our view of § 4(a).  "Statements by opponents of a bill and failure to enact suggested amendments, although they have some weight, are not the most reliable indications of congressional intent." *Bryant v. Yellen*, 447 U.S. 352, 376 (1980); *see Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1315 (8th Cir. 1980).  Other features of the proposed NLGA amendment may have contributed to its defeat.  *See* 75 Cong. Rec. 4762-65 (1932).  The argument also proves too much, because even without mention of employers in § 2, the Act expressly restricts the issuance of injunctions against employers in circumstances that might otherwise violate the antitrust laws.  *See Cal. State Council of Carpenters v. Associated Gen. Contractors of Cal., Inc.*, 648 F.2d 527, 544-45 (9th Cir. 1980) (discussing 29 U.S.C. § 104(b)), *rev'd on other grounds*, 459 U.S. 519 (1983).  At any rate, we consider here only the scope of a district court's authority to issue injunctions, not the liability of employers under the antitrust laws.

labor and capital. *It asks for the laboring man nothing that it does not concede to the corporation.*") (emphasis added); *see also* Edward B. Miller, *Antitrust Laws & Employee Relations* 15-25 (1984). As is often the case, the legislative history offers something for both parties, but it does not supply a convincing basis to depart from our analysis of the text.

One last point raised by the Players is that § 4(a) of the NLGA merely paraphrases language in § 20 of the Clayton Act that forbade injunctions prohibiting "any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor." 29 U.S.C. § 52; *see* Frankfurter & Greene, at 217. They contend that the Supreme Court in *American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 203 (1921), authoritatively construed a related portion of § 20 as applying *only* to employees, and that Congress should be understood to have incorporated this "settled meaning" when it enacted the Norris-LaGuardia Act. By way of post-argument submission, they also draw our attention to the legislative history of the Clayton Act. *E.g.*, S. Rep. No. 63-698, at 51 (1914) ("The words 'singly or in concert' are inserted . . . to guard the right of workingmen to act together in terminating, if they desire, any relation of employment, and to act together and in concert in doing or abstaining from doing any other of the acts named in that paragraph of the section.").

We do not agree that *American Steel Foundries* established the asserted meaning. The cited portion of the case did not concern the specific clauses that evidently were paraphrased in § 4(a) of the NLGA, and because the case arose from an injunction issued against employees, the court addressed § 20 of the Clayton Act only as it applied to employees. There was no question raised in the case about whether or how § 20 and the "terminating any relation of employment" clause applied to employers.

When the Second Circuit later addressed the Clayton Act in a discussion of mutiemployer collective bargaining, it reasoned that "[a]lthough Congress was largely concerned with the effect of [federal court] interference on unions, the statute was phrased in an evenhanded fashion to protect employer conduct in labor disputes as well as that of unions. Section 20 thus exempted from federal prohibition 'persons . . . terminating any relation of employment . . . or withholding . . . moneys or things of value,' language that would permit multiemployer lockouts." *NBA v. Williams*, 45 F.3d 684, 689 (2d Cir. 1995) (quoting 29 U.S.C. § 52); *see Brown*, 50 F.3d at 1055 (quoting *Williams*, 45 F.3d at 689); *see also* 51 Cong. Rec. 14,334 (1914) ("[T]he paragraph is reciprocal.") (remarks of Sen. Thomas). We need not here decide whether the Clayton Act protects multiemployer lockouts; it is sufficient for present purposes that the NLGA incorporated no settled judicial interpretation that § 20 applied only to employees.

For these reasons, we conclude that § 4(a) of the Norris-LaGuardia Act deprives a federal court of power to issue an injunction prohibiting a party to a labor dispute from implementing a lockout of its employees. This conclusion accords with the few decisions that have addressed the specific question. *Clune v. Publishers' Ass'n of N.Y.C.*, 214 F. Supp. 520, 528-29 (S.D.N.Y.), *aff'd*, 314 F.2d 343, 344 (2d Cir. 1963) (per curiam); *Plumbers & Steamfitters Local 598 v. Morris*, 511 F. Supp. 1298, 1311 (E.D. Wash. 1981); *Stone & Webster Eng'g Corp.*, 163 F. Supp. at 896.[8] Because the Norris-LaGuardia Act prohibits the district court from issuing an injunction against the League's lockout of employees, the court's order cannot stand.

---

[8]In *Chicago Midtown Milk Distributors*, 1970 WL 2761, at *1, the Seventh Circuit reversed an injunction prohibiting two companies from refusing to supply and sell processed milk and other dairy products to certain distributors. The complaint alleged that "a refusal to deal based upon a lockout" violated the Sherman Act. In holding that the injunction was precluded by the NLGA, the court cited only § 1 of the Act. The court's reasoning is not well explained, and the opinion does not directly address § 4(a).

B.

Another portion of the injunction is not foreclosed by § 4(a). The district court enjoined not only the League's lockout of employees, *i.e.*, players under contract, but also the League's refusal to deal with non-employees, *i.e.*, free agents and prospective players or "rookies." As to these latter groups of players, § 4(a) does not apply. The refusal of the League and NFL clubs to deal with free agents and rookies is not a refusal "to remain in any relation of employment," for there is no existing employment relationship in which "to remain."

An injunction with respect to the League's actions toward free agents and rookies, however, cannot be issued except in strict conformity with § 7 of the NLGA, 29 U.S.C. § 107, because this is "a case involving or growing out of a labor dispute." *Id.* §§ 101, 107. The present injunction does not conform to § 7.

We disagree with the Players that the League forfeited its claim that the injunction must comply with § 7 by failing to raise the point in its brief in the district court. The district court raised the applicability of § 7 at oral argument, at which time the League argued that further procedures were required. Appellants' App. 521-23. The district court did not treat the point as forfeited or waived, concluding only that it was unnecessary to address § 7 because the court thought the NLGA wholly inapplicable. *Brady I*, 2011 WL 1535240, at \*23 n.41. And this court has considered compliance with the NLGA even when the issue was not raised in the district court. *Ozark Air Lines, Inc.*, 797 F.2d at 562.

Section 7 provides that a court has no authority to issue an injunction "except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto." 29 U.S.C. § 107. Although a hearing is not required where the party enjoined does not contest on appeal that the relevant facts are

-33-

undisputed, *Kansas City S. Transp. Co. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1067-68 (8th Cir. 1997), the League does contest the facts in this case, and it is entitled to test the credibility of the Players' evidence by cross-examination. Section 7(c) requires the court to evaluate the relative harms to the parties, and the court's calculus with respect to free agents and rookies undoubtedly was affected by its view that the entire lockout could be enjoined. Whether to enter an injunction requiring the League to deal with free agents and rookies, only to have these players locked out as soon as they enter into any new contract of employment, was not considered. The League also raises arguments concerning § 7(a) and § 7(e), which should be addressed by the district court in the first instance as necessary. *Compare, e.g.*, *Mackey*, 543 F.2d at 623, *and Donnelly Garment Co. v. Dubinsky*, 154 F.2d 38, 43 (8th Cir. 1946), *with E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 708 (7th Cir. 2005), *and Wilson & Co.*, 105 F.2d at 950-52. We therefore conclude that the injunction as a whole must be vacated.

## IV.

Given our conclusion that the preliminary injunction did not conform to the provisions of the Norris-LaGuardia Act, we need not reach the other points raised by the League on appeal. In particular, we express no view on whether the League's nonstatutory labor exemption from the antitrust laws continues after the union's disclaimer. The parties agree that the Act's restrictions on equitable relief are not necessarily coextensive with the substantive rules of antitrust law, and we reach our decision on that understanding. *See Burlington Northern*, 481 U.S. at 435 n.3; *Order of R.R. Telegraphers*, 362 U.S. at 339 n.15; *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 103 (1940); *Burlington N. Santa Fe. Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 712 n.12 (9th Cir. 2000) (en banc); *cf. Hutcheson*, 312 U.S. at 234-36; *L.A. Meat & Provision Drivers' Union v. United States*, 371 U.S. 94, 107 n.2 (1962) (Goldberg, J., concurring).

\* \* \*

The district court's order of April 25, 2011, granting a preliminary injunction is vacated, and the case is remanded for further proceedings.

BYE, Circuit Judge, dissenting.

In 1914, after twenty years of judicial interference in labor conflicts on the side of the employers, Congress stepped in to protect organized labor by passing sections 6 and 20 of the Clayton Act. Section 20 of the Act generally prohibited the issuance of injunctions in cases involving or growing out of labor disputes. *See* 29 U.S.C. § 52. It soon became apparent, however, that what was supposed to be the "charter of liberty of labor," Felix Frankfurter & Nathan Greene, The Labor Injunction 164 (1930) (remarks of William Howard Taft), fell short of the promise. The *Lochner*-era judges adopted a narrow interpretation of the Act, restricting it to "trade union activities directed against an employer by his own employees." *United States v. Hutcheson*, 312 U.S. 219, 230 (1941). "[T]o protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act," *id*. at 236, Congress passed the Norris-LaGuardia Act, under which "the allowable area of union activity was not to be restricted . . . to an immediate employer-employee relation." *Id.* at 231. Through its holding in this case today, the majority reaffirms the wisdom of the old French saying used by Felix Frankfurter and Nathan Greene when describing judicial reluctance to enforce § 20 of the Clayton Act: "the more things are legislatively changed, the more they remain the same judicially." Felix Frankfurter & Nathan Greene, The Labor Injunction 176 (1930). Despite the repeated efforts of the legislative branch to come to the rescue of organized labor, today's opinion puts the power of the Act in the service of employers, to be used against non-unionized employees who can no longer avail themselves of protections of labor laws. Because I cannot countenance such interpretation of the Act, I must and hereby dissent.

-35-

I.

A.      "Labor Dispute"

First, I have to disagree with the majority's reading of the term "labor dispute." As the majority recounts, "[t]he underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction." *United States v. Hutcheson*, 312 U.S. at 235-36. The unequivocal goal of the new legislation was to overturn the Supreme Court's decisions in *Duplex Printing* and *Bedford Cut Stone*, which had restricted § 20 of the Clayton Act to labor union activities directed against employees' immediate employers. *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 805 (1945). Congress accomplished the goal by clarifying that the term "labor dispute"

> includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee*.

29 U.S.C. § 113(c) (emphasis added).

However, in passing the NLGA, Congress never intended to change the well-accepted calculus of the Clayton Act as the legislation for the benefit of organized labor.   The Clayton Act was always understood as an attempt to assist the organized labor movement at the time its progress was impeded by judicial misuse of injunctions. *See, e.g., Hutcheson*, 312 U.S. at 229-30 (explaining § 20 of the Clayton Act "withdrew from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them"); *Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n of N. Am.*, 274 U.S. 37, 56 (1927) (separate

-36-

opinion by Stone, J.) (describing the Clayton Act as being concerned with "organized labor"); *Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 208-09 (1921) ("Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects."); *see also* Frankfurter & Green, The Labor Injunction, at 130-31, 139 (describing the Clayton Act's preoccupation with organized labor). It is this well-entrenched understanding of the term "labor dispute" as centered on the struggle between employers and organized labor that informs interpretation of the same definition under the NLGA. *See Bruesewitz v. Wyeth LLC*, 131 S.Ct. 1068, 1082 (2011) ("When 'all (or nearly all) of the' relevant judicial decisions have given a term or concept a consistent judicial gloss, we presume Congress intended the term or concept to have that meaning when it incorporated it into a later-enacted statute.") (citation omitted).

Like the Clayton Act, the NLGA has been consistently cited in connection with protection of unions' rights. *See Brown v. Pro Football, Inc.*, 518 U.S. 231, 253 n.2 (1996) (dubbing §§ 6 and 20 of the Clayton Act and the NLGA as the "organized labor's exemption from federal antitrust laws"); *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 726 (1982) (elaborating on the plain meaning of § 13(a) of the NLGA and noting the Act protects "union organizational efforts and efforts to improve working conditions"); *H.A. Artists & Assoc., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 717 n.20 (1981) ("Of course, a party seeking refuge in the statutory exemption must be a bona fide labor organization. . . ."); *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975) (stating the Clayton Act and the NLGA "declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities" from their purview); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772 (1961) ("The Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101-115, expresses a basic policy against the injunction of activities of labor unions."); *Hutcheson*, 312 U.S. at 231 (the NLGA "established that the allowable area of union activity was not to be restricted, as it had been in the *Duplex* case, to an immediate employer-employee

relation"). This interpretation is in part dictated by § 2 of the Act, which "explicitly formulated the 'public policy of the United States' in regard to the industrial conflict." *Hutcheson*, 312 U.S. at 231. Such public policy expressed concern with the plight of the "individual unorganized worker," whom Congress deemed "helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment" when confronted with "corporate and other forms of ownership association" assumed by employers. 29 U.S.C. § 102. Commenting on the judicial respect § 2 deserves, the Supreme Court explained that "[t]here are few pieces of legislation where the congressional hearings, committee reports, and the language in the legislation itself more clearly point to the necessity for giving an Act a construction that will protect the congressional policy the Act adopted." *See Order of R.R. Telegraphers v. Chicago & N. W. R.R. Co.*, 362 U.S. 330, 335 (1960). In the NLGA's case, the congressional policy was about helping the unions.

The majority attempts to diminish the significance of § 2's emphasis on organized labor by drawing attention to the part of the section which declares that an "individual unorganized worker" shall be free from the interference of employers in "self-organization or other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The majority finds it significant that the National Labor Relations Act, which guarantees employees the right to "self-organization . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, has been interpreted not to require the presence of the union. *NLRB v. Washington Aluminium Co.*, 370 U.S. 9 (1962); *Mohave Elec. Co-op, Inc. v. NLRB*, 206 F.3d 1183, 1189 & n.6 (D.C. Cir. 2000). While the definitions of the term "labor dispute" in the NLGA and NLRA, it is true, overlap, "the extent of the prohibition against injunctive relief contained in Norris-LaGuardia [is] not coextensive with the National Labor Relations Act and the Board's jurisdiction over unfair labor practices." *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 686 n.23 (1981). To give one example of the differences between the

-38-

two statutes, the NLGA's injunction immunity is limited to labor disputes involving parties in "the same industry, trade, craft, or occupation," 29 U.S.C. § 113(a)-(b), whereas the NLRA does not have a similar limitation, *see* 29 U.S.C. § 152(9). And while the NLGA covers strikes about political issues which are beyond the scope of the immediate employment relationship, *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 710-15, the NLRA does not, *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 225-26 (1982). Most critically, unlike the NLRA, the NLGA does not expressly protect concerted employee activities.

The phrase "mutual aid or protection" in § 2 of the NLGA had a "heuristic purpose" – i.e., to inform the courts of the "considerations moving Congressional action." Richard Michael Fischl, *Self, Other, and Section 7: Mutualism and Protected Protest Activities Under the National Labor Relations Act*, 89 Colum. L. Rev. 789, 847 (1989) (quoting Frankfurter & Greene, The Labor Injunction, at 212). The phrase most likely originated from the "ideology of mutualism, rooted in working-class bondings and struggles," as contrasted with the philosophy of individualism embraced by "the prosperous and wellborn." *Id.* at 851(quoting D. Montgomery, The Fall of the House of Labor 2, 171 (1987)). The judicial gloss put on the terms "concerted activity" and "mutual aid and protection" years later, in the context of a different statute, cannot be used to undermine the Act's express concern with the success of the organized labor movement.

The majority also overstates by attributing too much significance to the Supreme Court's decision in *New Negro Alliance*, where the NLGA was applied in the context of a picket by an association of African Americans who, having been largely excluded from membership in the established unions, adopted the "traditional tactics of organized labor." Kenneth W. Mack, *Rethinking Civil Rights Lawyering and Politics in the Era Before* Brown, 115 Yale L. J. 256, 319 (2005). Such reliance on *New Negro Alliance* is unjustified. The decision presented a different question of whether the association had to have the employment relationship with the employer

and whether the racial struggle underlying the dispute was antithetical to finding a "labor dispute" within the meaning of the NLGA. Prior to the Supreme Court's decision, various circuits had apparently disagreed on the answers, and the lower courts' rulings held the NLGA inapplicable on these grounds. While setting the courts on the correct path with respect to the questions raised, the Court did not discuss whether a union was a *sine qua non* to the NLGA's applicability. In addition, in subsequent decisions the Court clarified, "a party seeking refuge in the statutory exemption [from antitrust liability] must be *a bona fide labor organization*, and not an independent contractor or entrepreneur." *H.A. Artists & Associates, Inc.*, 451 U.S. at 717 n.20 (emphasis added). The Eighth Circuit agreed the absence of concerted labor activities disqualifies the subjects of the injunction from protection under the NLGA. *Ozark Air Lines, Inc. v. Nat'l Mediation Bd.*, 797 F.2d 557, 563 (8th Cir. 1986) (stating a concerted activity is at the heart of the NLGA, which does not apply to the case because, among other things, it "has nothing to do with . . . concerted labor activities"). Even if *New Negro Alliance* could leave the impression that a union is not required for the NLGA to apply, the Supreme Court's subsequent insistence on the NLGA's beneficiary status as a bona fide labor organization exposes such impression as being false.

This is not surprising. Organized labor activity serves as the necessary limiting principle circumscribing the application of the NLGA. Without such limiting principle, the Act would tie the courts' hands in granting injunctive relief in many routine cases where parties seek to enforce various aspects of individual employment contracts. Because courts have never viewed the NLGA as an obstacle to such exercise of equity powers, *see, e.g., N.I.S. Corp. v. Swindle*, 724 F.2d 707 (8th Cir. 1984) (upholding the grant of a preliminary injunction enforcing a covenant not to compete), the reading of the term untethered to unionization and collective bargaining activity does not make sense.

B.      "Involving or Growing Out"

Second, I must take issue with the majority's conclusion as to this case not representing the outer boundary of the phrase "involving or growing out of a labor dispute."  Like the nonstatutory labor exemption, statutory exemption from antitrust liability, which rests in part on the Norris-LaGuardia Act, *Connell Construction Co.*, 421 U.S. at 621-22, lies at the intersection between labor and antitrust laws.  *Allen Bradley Co.*, 325 U.S. at 806 (elaborating on the responsibility to reconcile "two declared congressional policies" – one "seek[ing] to preserve a competitive business economy" and one seeking "to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining"); *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 76 (1st Cir. 2008) (stating that both the statutory and the nonstatutory labor exemption were developed "[t]o balance the competing federal policies supporting organized labor on one hand and business competition on the other"); *Mackey v. NFL*, 543 F.2d 606, 613 (8th Cir. 1976) (availability of the labor exemption "turns upon whether the relevant federal labor policy is deserving of pre-eminence over federal antitrust policy under the circumstances of the particular case").  "While the Norris-LaGuardia Act's bar of federal-court labor injunctions is not explicitly phrased as an exemption from the antitrust laws, it has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes."  *H.A. Artists & Associates, Inc.*, 451 U.S. at 714.  The scope of the two exemptions differs somewhat – "the statutory exemption allows unions to accomplish some restraints by acting unilaterally, [whereas] the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market," *see Connell Construction Co.*, 421 U.S. at 622, – but there is no place for the application of either at the time labor laws no longer govern and labor policy is no longer implicated.

-41-

The Supreme Court recognized as much when it explained that nonstatutory immunity from antitrust review is no longer necessary when "an agreement among employers [is] sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Brown*, 518 U.S. at 250. As an example of such endpoint, the Court cited "collapse of the collective-bargaining relationship, as evidenced by decertification of the union." *Id.* (quoting *Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1057 (D.C. Cir. 1995)). With the players having voted to end the NFLPA's status as their collective bargaining representative and the NFLPA likewise having disclaimed its status as the players' representative, this case has reached that endpoint. *See Brady v. NFL*, 640 F.3d 785, 798-99 (8th Cir. 2011) (Bye, J., dissenting) (elaborating on the reasons why the union disclaimer should end the protection against antitrust liability).

Indeed, the League itself anticipated dissolution of antitrust remedy fetters upon disclaimer of union representation, as is evident from its concessions in previous cases. *See Powell v. NFL*, 930 F.2d 1293, 1303 n.12 (8th Cir. 1989) (describing the League's concession that "the Sherman Act could be found applicable, depending on the circumstances, . . . if the affected employees ceased to be represented by a certified union"); *see also* Appellees Special Add. at 370 (transcript of the League's Supreme Court argument in *Brown v. Pro Football, Inc.*, where the League conceded antitrust immunities would not apply when "employees ultimately elect, in good faith, . . . to give up their rights under the labor laws"). The League's view was consistent with those of the courts, who saw disassociation from the union as the point beyond which labor laws yield to the antitrust regime. *Brown*, 50 F.3d at 1057 ("If employees wish to seek the protections of the Sherman Act, they may forego unionization or even decertify their unions. We note that the NFL players took exactly this latter step after the Eighth Circuit's *Powell* decision."); *Powell*, 930 F.2d at 1305 (Heaney, J., dissenting) (criticizing the majority opinion for continuing the labor exemption for too long – in effect, "until the bargaining relationship is terminated either by a NLRB

-42-

decertification proceeding or by abandonment of bargaining rights by the union"). This realization as to the players' membership in a union acting as a shield against the possibility of antitrust charges is the reason why, in the 1993 *White* settlement, the League insisted the NFLPA be reconstituted as the players' representative and the collective bargaining relationship between the parties be reestablished.

At some point in the "arising out of" spectrum, the antitrust immunities stemming from statutory and nonstatutory labor exemptions must come to an end and give way to antitrust remedies. Such point does not come a year from the union disclaimer, nor one business cycle from it, as suggested by the League's counsel. Rather, such point comes at the moment of the union disclaimer.

## II.

Although I would conclude the district court correctly determined this case does not involve or grow out of a labor dispute, thus negating any further application of the NLGA, I am compelled to write further addressing the majority's conclusion as to § 4(a) of the NLGA protecting employers. At least three other circuit courts have reached the opposite conclusion and, for the reasons set forth below, I find their reading persuasive. In interpreting § 4(a), these courts were guided by the legislative history of the NLGA, as well as the legislative history of the Clayton Act – from which the NLGA was drawn – both of which indicate the NLGA was not intended to protect employers. Finally, the stated purpose in § 2 of the NLGA confirms the statute should be interpreted in such a manner as to protect employees, rather than employers.

I start from where the majority began its analysis, with a review of the pertinent cases discussing whether § 4(a) prohibits injunctions against employers. In *De Arroyo v. Sindicato de Trabajadores Packinghouse*, 425 F.2d 281, 291 (1st Cir. 1970), the First Circuit concluded § 4(a) does not protect employers, albeit in the context of whether the remedy of reinstatement in a case under § 301 of the Labor Management

-43-

Relations Act was barred by the NLGA. *De Arroyo* rejected a strictly literal interpretation of § 4(a) because such a reading "completely disregards the primary purpose behind the anti-injunction provisions, 'to protect working men in the exercise of organized, economic power . . . to correct existing abuses of the injunctive remedy in labor disputes . . . to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.'" *Id.* at 290-91 (quoting *Bhd. of R.R. Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 40-41 (1957)). The court also referenced the legislative history behind § 4(a), which indicated the provision "was not intended as a protection for employers." *Id.* at 291. Instead, the court reasoned, "[t]he 'remain in any relation of employment' language . . . was used . . . simply to make clear that employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation with their employer." *Id.*

*De Arroyo* was in line with a case decided by the Seventh Circuit eight years earlier, *Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co.*, 310 F.2d 513, 517 (7th Cir. 1962), which conducted "a thorough examination of the Act and its pertinent legislative history." According to the Seventh Circuit, "our study of that history and the language of the Act . . . convinces us that the purpose of Congress in this respect was to protect only employees and unions." *Id.* at 518. The court continued, "[w]e find nothing in the statement of policy to indicate any intention to deny jurisdiction to issue injunctions against employers," save for the same exceptions referenced by *De Arroyo*. *Id.* In sum, the Seventh Circuit deferred to Congress's authority:

> The enactment of the Act, was, of course, the responsibility of Congress, and not that of this court. That Congress may have been intent upon shielding organizations of employees from injunctions rather than employers was and is a matter within its province. The same can be said of the exemption of labor organizations from the sanctions of antitrust

-44-

laws. Those are matters over which the courts have no control, in the absence of a constitutional attack.

    The language used clearly negatives any intention to recognize any general reciprocity of rights of capital and labor. Essentially the Act is frankly a charter of the rights of labor against capital.

*Id.* Given the language and history of § 4, the Seventh Circuit concluded the NLGA did not prevent the issuance of an injunction. *Id.*

    Building upon the decisions of the First and Seventh Circuits, the Ninth Circuit issued perhaps the most comprehensive decision on the issue in *Local 2750, Lumber & Sawmill Workers Union v. Cole*, 663 F.2d 983 (9th Cir. 1981). Although *Lumber & Sawmill Workers* again involved § 301 of the LMRA, the court discussed at length the application of § 4(a). *Id.* at 985-987. Specifically, the court agreed with *De Arroyo* because "section 4(a) does not refer to any right of an employer not to continue the employment relationship, but was used to make clear that strikes could not be enjoined even when the strikers claimed to have completely ended the employment relationships, as well as when they claimed to have ceased work only temporarily." *Id.* at 986. To further support this assertion, the court noted, "[t]he second clause of section 4(a) apparently originated in section 20 of the Clayton Act, where it was clearly intended to apply to the termination of the work relationship by the employee rather than the employer." *Id.* Ultimately, after considering the text and history of § 4(a), as well as the history of the Clayton Act, the Ninth Circuit concluded "[s]ection 4(a) was intended to protect the right of workers and labor unions to strike," and thus the reinstatement order under § 301 was not barred by the NLGA. *Id.* at 986-87; *see also Retail Clerks Union Local 1222, AFL-CIO v. Alfred M. Lewis, Inc.*, 327 F.2d 442, 446 (9th Cir. 1964) ("While the writer of this opinion agrees with the view expressed by the 7th Circuit . . . that the purpose of Norris-LaGuardia was to protect only employees and unions, except for two isolated exceptions appearing in section

3(a, b), and in section 4(b), it is not necessary for us in this case to go so far.") (internal citations omitted).

While the majority acknowledges each of the above decisions, it criticizes the courts' reasoning at the outset by focusing on one of the underlying aspects contained therein "that when employers were intended to be protected, as in section 4(b), they were specifically named." *Lumber & Sawmill Workers*, 663 F.2d at 985. Citing to *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1352, 1355 (8th Cir. 1995), the majority concludes, "[t]his court already has recognized that § 4(c) applies to injunctions against employers . . . so the premise of *De Arroyo* and *Lumber & Sawmill Workers* that employers are protected against injunction under § 4 only when specifically mentioned in § 4(b) is a non-starter under circuit precedent." Ante at 24; *see also id.* at 24 n.5 (distinguishing the Seventh Circuit's decision due to "this court's precedent that § 4 applies to injunctions against employers").

With due respect to the majority, *Bridgestone/Firestone* did not so hold. *Bridgestone/Firestone* revolved around an injunction issued in favor of a union against an employer under an exception to the NLGA provided in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), which applies "'if the strike is over a dispute which under the parties' collective bargaining agreement should be submitted to arbitration.'" 61 F.3d at 1352 (quoting *John Morrell & Co. v. Local Union 304A*, 804 F.2d 457, 459 (8th Cir. 1986)). Within this context, the court was tasked with determining "whether the *Boys Markets* exception applies . . . where the union has sought and obtained an injunction against the company," which was "an issue of first impression in this circuit." *Id.* Following the lead of three circuits which had "unanimously concluded that the *Boys Markets* rationale should be extended to allow for injunctions against employers," the court likewise held the exception applied equally to employers. *Id.* The court then went on to analyze whether the *Boys Markets* test was satisfied, answering such question in the negative because the union

"failed to demonstrate that without the injunction the arbitration proceeding would be frustrated or rendered a nullity." *Id.*

A careful reading of *Bridgestone/Firestone* reveals it has no bearing on the present question of whether § 4(a) protects employers. Namely, whether the *Boys Markets* exception applies to employers and employees alike is an entirely different question than whether § 4(c), much less § 4(a), touches even-handedly on employers and employees. *See, e.g.*, *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 581 (2d Cir. 2000) (distinguishing *Niagara Hooker Emp. Union v. Occidental Chem. Corp.*, 935 F.2d 1370 (2d Cir. 1991), which *Bridgestone/Firestone* relied on, because "*Niagara Hooker*'s focus was not all conceivable labor disputes, but only those concerning arbitrable issues," and thus the reverse *Boys Markets* exception was "wholly inapplicable to a case, like this one, in which the labor dispute concerns non-arbitrable issues"). In sum, while it is true *Bridgestone/Firestone* ultimately overturned an injunction against the employer, *see id.* at 1355, the court made no inquiry whatsoever as to whether § 4 *itself* protects employers equally, notwithstanding the *Boys Markets* exception, and therefore *Bridgestone/Firestone* does not contain any recognition or precedent applying § 4(c) to employers. Correspondingly, *Bridgestone/Firestone* is not in conflict with the three circuit cases discussed above which bear directly on the question at hand.

Even if *Bridgestone/Firestone* stands for the proposition asserted by the majority, I respectfully disagree with the majority's subsequent statutory interpretation. The majority rejects the Players' argument distinguishing between temporary and permanent work stoppages in the first and second clauses of § 4(a). Instead, advancing the broad scope of the term "any," the majority construes "[r]efusing to . . . remain in any relation of employment" to encompass non-permanent work stoppages "such as a strike or lockout of employees." Ante at 25-26. However, the majority rejects the NFL's counterpart argument that "the second clause should

be understood as applying *only* to employers." *Id.* at 27 (emphasis in original). In doing so, the majority concedes its interpretation is asymmetrical because "[e]mployees may refuse to perform work under the first clause, and they may refuse to remain in a relation of employment under the second." *Id.*

I have considerable doubt about the majority's interpretation of § 4(a). First, there is little basis in the text for reading § 4(a) as referring only to employees under the first clause but to both employees and employers under the second clause. Moreover, the breadth with which the majority interprets the second clause as it relates to employers ostensibly covers the employee conduct encompassed under the majority's reading of the first clause. Stated differently, under the majority's remarkably broad interpretation, a refusal to perform any work by employees would be tantamount to a refusal to remain in any relation of employment because "it changes the condition or character of that relationship" in some fashion. Ante at 25-26. Such an interpretation, which conflates the two clauses, cannot stand because it renders the first clause superfluous. *See Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 609 (8th Cir. 2011) ("We avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress.") (internal quotation marks and citation omitted).

Second, and perhaps more importantly, the majority's interpretation fails to give effect to Congress's intent in passing the NLGA. *See Ortega-Marroquin v. Holder*, 640 F.3d 814, 818 (8th Cir. 2011) (noting courts must give effect to the intent of Congress when clear); *see also Boys Markets, Inc.*, 398 U.S. at 250 ("Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions."). Returning to the legislative history discussed in depth above, which bears some repetition in the context of § 4, the NLGA "was enacted in response to federal-court intervention on behalf of employers," which "had caused the federal judiciary to fall into disrepute among large segments of this

-48-

Nation's population." *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 715; *see also id.* at 716 ("The legislative history is replete with criticisms of the ability of powerful employers to use federal judges as 'strike-breaking' agencies").

Attempting to remedy this inequity, the House Committee on the Judiciary explained about the NLGA, "[t]he purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act . . . , which act, by reason of its construction and application by the Federal courts is ineffectual to accomplish the congressional intent." H.R. Rep. No. 669, 72d Cong., 1st Sess. 3 (1932). According to the Committee, because federal courts were in the pocket of employers, the restrictions contained in § 20 of the Clayton Act had "'become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect.'" *Milk Wagon Drivers' Union v. Lake Valley Farm Prods., Inc.*, 311 U.S. 91, 102 (1940) (quoting H.Rep. No. 669, pp. 7, 8). Reviewing these committee reports, the Supreme Court concluded, "[w]hether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act." *Id.* at 103. Indeed, even the League concedes this much. *See* Blue Br. at 27 ("There is no doubt that concerns about injunctions against labor unions, rather than injunctions against employers, were the principal catalyst for the bill.").

Then-Professor Frankfurter, a drafter of the NLGA, wrote § 4 "provides that in cases growing out of labor disputes, no persons participating in, or affected by, such disputes shall be enjoined from striking, or from striking for the success of strikes, by customary labor union effort, short of fraud or violence." Felix Frankfurter & Nathan Greene, *The Labor Injunction* 215 (1930). Professor Frankfurter explained § 4 was "a paraphrase of like language in the Clayton Act which was held to be merely

-49-

declaratory of the modern common law right to strike." *Id.* at 217-18; *see generally Carcieri v. Salazar*, 129 S.Ct. 1058, 1065 n.5 (2009) (noting the author of the legislation was "an unusually persuasive source as to the meaning of the relevant statutory language"). Eleven years later, then Supreme Court Justice Frankfurter confirmed this principle on the Supreme Court:

> The relation of the Norris-LaGuardia Act to the Clayton Act is not that of a tightly drawn amendment to a technically phrased tax provision. The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction. This was authoritatively stated by the House Committee on the Judiciary.

*Hutcheson*, 312 U.S. at 235-36.

As an assist in the interpretation of § 4(a), it is therefore helpful to look to § 20 of the Clayton Act, which prohibits injunctions against "terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do." 29 U.S.C. § 52. The Supreme Court construed this language as forbidding injunctions against "recommending, advising or persuading others by peaceful means to cease employment and labor." *Am. Steel Foundries*, 257 U.S. at 203. The Court continued, "[i]t is clear that Congress wished to forbid the use by the federal courts of their equity arm to prevent peaceable persuasion by employees, discharged or expectant, in promotion of their side of the dispute." *Id.*

Delving deeper into the Clayton Act, the legislative history behind the "terminating any relation of employment" clause further confirms Congress intended to protect only employees. *See Lumber & Sawmill Workers*, 663 F.2d at 986 ("The second clause of section 4(a) apparently originated in section 20 of the Clayton Act,

-50-

where it was clearly intended to apply to the termination of the work relationship by the employee rather than the employer."). The House Committee acknowledged, "[t]he consensus of judicial view . . . is that workingmen may lawfully combine to further their material interests without limit or constraint, and may for that purpose adopt any means or methods which are lawful. It is the enjoyment and exercise of that right and none other that this bill forbids the courts to interfere with." H.R. Rep. No. 63-627, at 32 (1914). The Senate Committee likewise stated the language was intended "to guard the right of workingmen to act together in terminating, if they desire, any relation of employment, and to act together and in concert in doing or abstaining from doing any other of the acts named in that paragraph of the Section." *Lumber & Sawmill Workers*, 663 F.2d at 986 n.5 (quoting S. Rep. No. 63-698, at 51 (1914)).

Finally, if the legislative history left any lingering doubt about whether § 4(a) protects employers, Congress conclusively resolved any ambiguity by building the purpose into the NLGA itself via § 2. "Specifically, the Congress found that prevailing socio-political and economic conditions prevented individual workers from obtaining 'acceptable terms and conditions of employment'" and thus the NLGA "sought to ensure workers the right to organize and conduct union activities 'free from the interference, restraint, or coercion' of employers or their agents by means of labor injunctions." *Burlington N. R.R. Co. v. United Transp. Union*, 848 F.2d 856, 861 (8th Cir. 1988) (citing 29 U.S.C. § 102). Senator Norris made clear § 2 was to be utilized as a guide to judicial interpretation which would "'relieve . . . many of the difficulties which have heretofore existed when a court has been called upon to interpret the law' – obviously thinking of the Supreme Court's interpretation of the Clayton Act." James M. Altman, *Antitrust: A New Tool for Organized Labor?*, 131 U. Pa. L. Rev. 127, 151 (1982) (quoting 75 Cong. Rec. 4503 (1932)).

In response to the policy statement offered by Senator Norris, Senator Hebert, the author of the Senate Judiciary Committee's minority report, proposed language to

§ 2 to protect "both the employer and the employee." *Id.* at 152 (quoting 75 Cong. Rec. 4677 (1932)). Senator Hebert disclosed his substitute "'trie[d] to afford the same degree of consideration to the employer in his relations to his employees as it does to the employee in his relations with his employer'" because the majority bill contained "'very little, if any, reference to the consideration that is to be given to the employer in his relations with his employee.'" *Id.* (quoting 75 Cong. Rec. 4678). Following a colloquy, Senator Hebert's substitute "was defeated soundly." *Id.* (noting the vote was 47 to 18). "That vote . . . makes it quite clear that in passing the Norris-LaGuardia Act Congress had no intent to relieve employers of any liability under the antitrust laws." *Id.* at 153. Even if Congress had such intent, "the scope of such an exemption would be narrowly limited by the terms of the Act." *Id.* at 154 ("[T]he only subsection in section 4 that refers to an employer's activities is 4(b)").

Although the majority attempts to minimize the congressional defeat of employer protections in the NLGA, there can be little doubt this legislative history provides yet more support for a reading of § 4(a) which protects only employees. *See, e.g.*, *United States v. United Steelworkers of Am.*, 271 F.2d 676, 683 (3d Cir. 1959) ("Our conclusion in this regard is confirmed, we think, by contrasting the statute as enacted with the House proposal which was rejected."). Indeed, the Supreme Court has previously placed significant weight on similar legislative history when construing the NLGA, as well as other labor statutes. *See, e.g.*, *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 439-440 (1987) ("After lengthy debate, punctuated with numerous references to the notorious Pullman Strike of 1894, the House refused an amendment proposed by Representative Beck that would have exempted railroads from the coverage of the Act. The historical background of the Norris-LaGuardia Act thus reveals that Congress intended to preclude courts from enjoining secondary as well as primary activity, and that the railroads were to be treated no differently from other industries in this regard.") (citation omitted); *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 412-416 (1981) ("The legislative debates and the process of legislative amendment demonstrate that Congress

deliberately chose" not to include a provision defeated in the House bill regarding section 301 of the Labor Management Relations Act).

Viewing the legislative history of § 4(a) in its entirety, Congress did not intend to protect employers under the provision. *See De Arroyo*, 425 F.2d at 291 ("Our understanding of the legislative history behind section 4(a) leads us to conclude that that section was not intended as a protection for employers."). Moreover, the purpose delineated in § 2 further bolsters this conclusion. *See Baseball Players and the Antitrust Laws*, 53 Colum. L. Rev. 242, 249 n.71 (1953) ("Given the purpose of the Norris-LaGuardia Act it is improbable that an association of employers which deprives an 'individual unorganized worker' of his 'freedom of labor' comes within its protection."). Interpreting the text of § 4(a) in light of the legislative history and express policy of the NLGA, I would conclude § 4(a) does not protect employers.

In the end, I find illustrative the wise words of Judge Learned Hand:

> Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945). In this case, "the fact remains that Congress passed the Norris-LaGuardia Act to forestall judicial attempts to narrow labor's statutory protection." *Bhd. of Maint. of Way Emps.*, 481 U.S. at 443. This is

exactly what the majority has done.  As a consequence, I am compelled to and must dissent.[9]

—————————————————

[9]Although the majority confines its analysis to the NLGA, I remain strongly convinced the other traditional injunction factors favor the Players.  *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 640 F.3d 304, 310 (8th Cir. 2011) (setting forth the factors a court must consider).  For the reasons set forth in my prior dissent, *see Brady v. NFL*, 640 F.3d 785, 794-96 (8th Cir. 2011) (Bye, J., dissenting), which have only intensified given the current juncture, I would affirm the district court.